IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTERNATIONAL FIDELITY<br>INSURANCE COMPANY, | : | CIVIL ACTION |
| | : | |
| | : | NO. 07-04750 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ANCHOR ENVIRONMENTAL, INC.,<br>et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

Giles, J.                                                                                                                                 May 1, 2008

### I.  Introduction

Before the court are Plaintiff International Fidelity Insurance Company's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Motion for a Preliminary and Permanent Injunction pursuant to Federal Rule of Civil Procedure 65.  Plaintiff brings suit against Defendants Anchor Environmental, Inc. ("Anchor") and Emlyn Webber ("Webber") for an alleged breach of an indemnity agreement concerning surety bonds for construction projects. Plaintiff seeks the entry of summary judgment against Defendant Webber in the sum of $89,076.00 to cover sums already expended by Plaintiff in discharge of its obligations as payment bond surety.  Plaintiff also seeks a decree for specific performance to compel Defendants Anchor and Webber to post collateral in the amount of $409,258.20 to cover Plaintiff's potential liability on bonds that it issued as surety for Anchor.  Plaintiff's Motion for Summary Judgment and Motion for a Preliminary and Permanent Injunction are granted herein for the reasons that follow.

## II.  Factual Background

Consistent with Fed. R. Civ. P. 56, the alleged facts in the light most favorable to the non-moving party follow.  Unless otherwise indicated, the following facts are undisputed and are findings of this court.

Plaintiff is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business located in Newark, New Jersey.  Plaintiff is authorized to do business in the Commonwealth of Pennsylvania and is in the business of, among other things, acting as corporate surety for the execution of contract and other types of surety bonds.

Defendant Anchor is a Pennsylvania Corporation with its principal place of business in Pennsylvania.  Anchor is insolvent and defunct.  (Def. Webber's Answer, Add'l Info. ¶ 3; Def. Webber's Resp. to Pl.'s Mot. for Summ. J. ¶ 24.)  Anchor did not enter an appearance or file an answer in this matter, and, upon motion by Plaintiff, default against Anchor was entered on January 22, 2008 and default judgment in the amount of $89,076.00 was entered on April 1, 2008.  Defendant Webber is a principal shareholder in and president of Anchor, and is an individual and citizen of Pennsylvania.

On or about November 22, 2004, Anchor, as contractor, and Webber, as indemnitor, made, executed, and delivered their joint and several Agreement of Indemnity in favor of Plaintiff.  The Agreement of Indemnity provided in pertinent part as follows:

> SECOND: The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and

conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefore. Such payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the Surety to the Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursement made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

. . .

THIRTEENTH: The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, unless the Contractor and the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interests, costs, expenses and attorneys' fees, including those of the Surety.

(Agreement of Indemnity, Compl., Ex. A at 1, 4.)

Beginning in July 2004, Anchor requested that Plaintiff, as surety, issue on behalf of Anchor, as principal, performance, payment, and bid bonds, which Anchor was required to furnish in order to submit bids for and enter into construction contracts with public entities.

On or about January 24, 2005, Plaintiff, as surety, in reliance on the Agreement of Indemnity and at the request of Defendants, issued on behalf of Anchor, as principal, certain bonds. These bonds included a performance bond and a payment bond in favor of Cheltenham Township, Pennsylvania, as obligee, and applicable to Anchor's contract with Cheltenham Township for the reconstruction of stone walls and pedestrian bridges in Tookany Creek Park in

Cheltenham Township (the "Tookany Creek Contract" or the "Project"). The performance bond was written in the penal sum of $451,600.00 and was conditioned upon Anchor's performance of the Tookany Creek Contract. The payment bond was written in the penal sum of $451,600.00 and was conditioned upon Anchor's paying all persons who supplied labor and/or material to Anchor or any of its subcontractors on the Project.

On or about May 24, 2005, Cheltenham Township declared Anchor in default of the Tookany Creek Contract. Plaintiff alleges, and Webber disputes, that Cheltenham Township made demand upon Plaintiff, as performance bond surety, to complete the Tookany Creek Contract. Plaintiff, however, has submitted two letters from Cheltenham Township, dated May 4, 2005 and May 19, 2005, notifying Plaintiff that Anchor was in default of the contract and of the township's intention to declare Anchor in breach of contract as provided in the performance bond. (Prelim. Inj. Hr'g, Apr. 14, 2008, Pl.'s Ex. 2A & 2B.)

It is uncontested that Anchor disputed Cheltenham's declaration of default and instituted a civil action for breach of contract against Cheltenham Township in the Court of Common Pleas of Montgomery County on July 29, 2005. The Montgomery County civil action is <u>Anchor Environmental, Inc. v. Cheltenham Township</u>, Civil Action No. 2005-19641. Cheltenham Township answered the Complaint, asserted a counterclaim against Anchor, and joined Plaintiff as an additional counterclaim defendant, seeking damages from Plaintiff arising out of Plaintiff's alleged default on the performance bond. (<u>See</u> Prelim. Inj. Hr'g, Apr. 14, 2008, Pl.'s Ex. 4.)

Plaintiff alleges, and Webber disputes, that as surety on the bonds, Plaintiff had a duty to investigate, evaluate, and respond to claims under the bonds, as well as discharge its obligations thereunder. Plaintiff alleges that it posted a reserve in the amount of $480,000.00, consisting of a

$400,000.00 loss reserve and a $80,000.00 expense reserve, because of the claim that had been asserted against the performance bond by Cheltenham Township and due to certain claims asserted by other parties against the payment bond.  (Pl.'s Mot. for a Prelim. & Perm. Inj. ¶ 15 & Tanzola Decl. ¶ 22.)

It is undisputed that Anchor did not pay certain claimants under the payment bond and that Plaintiff made payments to payment bond claimants.  Plaintiff alleges that, in discharge of its obligations as payment bond surety, it has already paid $89,076.00[1] to satisfy the claims of claimants against the payment bond, as well as in payment for attorney's fees and consultant's fees to investigate Cheltenham Township's declaration of default, defend the Montgomery County civil action, and enforce the terms of the Agreement of Indemnity.  (Pl.'s Mot. for Summ. J. ¶¶ 17-21 & Tanzola Decl. Ex. A; Pl.'s Mot. for a Prelim. & Perm. Inj. ¶¶ 19-21.)  Plaintiff alleges, and Webber disputes, that prior to Plaintiff making such payments to claimants, Defendants did not request that Plaintiff litigate or defend against such claims or deposit cash collateral with Plaintiff.

Plaintiff further alleges that, as a result of the above payments, the amount of the reserve is $409,285.20, which Plaintiff alleges consists of a $341,071.00 loss reserve and $68,214.20 expense reserve.  (Pl.'s Mot. for a Prelim. & Perm. Inj. ¶ 16; see Prelim. Inj. Hr'g, Apr. 14, 2008, Pl.'s Ex. 6.)  Simple calculation performed by the court reveals that Plaintiff has made some

---

[1] The court notes that Plaintiff's Motion for a Preliminary and Permanent injunction appears to contain a typographical error where Plaintiff cites the total amount already spent as $88,076.00, instead of the amount of $89,076.00 indicated in its Motion for Summary Judgment. The breakdown of Plaintiff's monetary dispensation – $58,928.80 in payments to claimants and $30,147.20 in attorney's and consultant's fees – is consistent in both motions and correctly totals $89,076.00.

errors in its reserve calculations, and that the correct total for the reserve amount is $390,924.00,[2] consisting of a $341,071.20 loss reserve and $49,852.80 expense reserve.

On November 9, 2007, Plaintiff commenced the present action. On April 14, 2008, the court held an evidentiary hearing on Plaintiff's motion for a preliminary and permanent injunction. After considering the arguments, testimony, and evidence presented, the court at the hearing granted Plaintiff's motion for a preliminary and permanent injunction, and this written opinion follows.

### III.  Plaintiff's Motion for Summary Judgment

**A.    Legal Standard for Summary Judgment**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under

---

[2] The $400,000.00 initial loss reserve minus the $58,928.80 in payments to claimants comes to $341,071.20, not $341,071.00 as Plaintiff claims. (See Pl.'s Mot. for a Prelim. & Perm. Inj. ¶ 16.) The $80,000.00 initial expense reserve minus the $30,147.20 in payments for attorney's and consultant's fees comes to $49,852.80, not $68,214.20, as Plaintiff claims. (See id.) Thus, the correctly recalculated loss reserve of $341,071.20 plus the correctly recalculated expense reserve of $49,852.80 comes to a total reserve of $390,924.00. Indeed, the $480,000.00 initial reserve minus the total expenditure of $89,076.00 claimed by Plaintiff, (see Pl.'s Mot. for Summ. J. ¶ 21), comes to the same remaining reserve total of $390,924.00.
   Plaintiff is not entitled to $18,361.20, the difference between the current reserve amount of $409,285.20 it claims and the correctly calculated current reserve amount of $390,924.00.

substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322-23.  In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion."  Seigel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).

**B.**     **Discussion**

The parties do not dispute that Pennsylvania law applies.  As Plaintiff correctly recognizes, this matter involves the straight-forward application of basic principles of contract and surety law to a factual record free of material disputes.

Under the Agreement of Indemnity, the submission of "vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety."  (Agreement of Indemnity, Compl., Ex. A at 1.)  The Agreement of Indemnity in this case is one commonly used in the surety industry and contains terms, including the *prima facie* evidence clause, that are routinely enforced by courts.  See, e.g., Fallon Elec. Co. v. Cincinnati Ins. Co., 121 F.3d 125, 129 (3d Cir. 1997); U.S. Fid. & Guar. Co. v. Feibus, 15 F. Supp. 2d 579, 582 (M.D. Pa. 1998), aff'd, 185 F.3d 864 (3d Cir. 1999); Int'l Fid. Ins. Co. v. United Constr., Inc., Civ. Action No. 91-2361, 1992 U.S. Dist. LEXIS 6777, at *6-7 (E.D. Pa. 1992); Curtis T. Bedwell & Sons, Inc. v. Int'l Fid. Ins., Civ. Action No. 83-5733, 1989 U.S. Dist.

LEXIS 5752, *7-8 (E.D. Pa. 1989). Under a *prima facie* evidence clause, once a surety has submitted the required documentation of payments, the burden shifts, under Federal Rule of Civil Procedure 56, to the principal to prove the existence of a genuine issue of material fact. Fallon Elec., 121 F.3d at 129; Feibus, 15 F. Supp. 2d at 582. Because the parties to the Agreement of Indemnification here were bound by a "good faith" standard, (see Agreement of Indemnity, Compl., Ex. A at 2), the indemnitor must prove bad faith or fraud on the part of the indemnitee in order to avoid payment. See Fallon Elec., 121 F.3d at 129 ("[W]hat an indemnitor must demonstrate to escape liability . . . depends on the precise language used in the agreement.").

Webber admits that he executed the Agreement of Indemnity and does not contest that Plaintiff made payments to payment bond claimants. Plaintiff has proffered evidence of its losses under the payment bond, namely itemized statements of each payment that are sworn to in a declaration by a claims specialist. (Pl.'s Mot. for Summ. J., Tanzola Decl. & Ex. A.) The burden therefore shifts to Webber to prove the existence of a genuine issue of material fact for trial regarding Webber's liability to Plaintiff.

Defendant Webber offers several arguments to show he is not liable to Plaintiff and that Plaintiff acted in bad faith. Webber argues that at a meeting on May 5, 2005, Plaintiff made promises that it would assist Anchor in completing the Project, but did not provide any such assistance. (Def. Webber's Resp. to Pl.'s Mot. for Summ. J. ¶ 11, Add'l Info. ¶¶ 2-3, 5.) He contends that, shortly after this meeting, Plaintiff terminated its representative and employee who allegedly made this promise at the meeting. (Def. Webber's Resp. to Pl.'s Mot. for Summ. J., Add'l Info. ¶ 5.) Webber argues that the termination of the Project was caused in part by Plaintiff's alleged unfulfilled promises, evidencing Plaintiff's bad faith. Plaintiff counters that

the surety had no obligation to bail the contractor out, and the Agreement of Indemnity supports this argument.  Webber has not produced any evidence that Plaintiff promised to assist in the cash flow to keep the Project running.  Even if Plaintiff had promised such assistance, this would not negate the enforceability of the Agreement of Indemnity to which Defendants agreed or excuse Defendants from their obligations thereunder.  Webber does not demonstrate bad faith on the part of Plaintiff.

Webber further argues that Plaintiff did not have an obligation to pay claimants because the payment bond was invalid and because Cheltenham Township did not accept the services supplied by the subcontractors.  (Def. Webber's Resp. to Pl.'s Mot. for Summ. J. ¶ 17.)  Webber intimates that the bonds were not valid because Plaintiff did not follow its guidelines in issuing the bonds.  (Def. Webber's Resp. to Pl.'s Mot. for Summ. J., Add'l Info. ¶ 5.)  In his Answer, Webber argues that Anchor's bid amount on the Tookany Creek Contract was significantly below the next bidder and that Plaintiff should not have supplied bonds when such significant bid variances existed.  (Def. Webber's Answer, Add'l Info. ¶ 7.)

Webber argues that Cheltenham Township defaulted by refusing to pay Anchor for phases of the Project it completed, even though Anchor allegedly spent $300,000 on the Project.  (Def. Webber's Resp. to Pl.'s Mot. for Summ. J. ¶ 17.)  Webber contends that Defendants made repeated requests, in phone conversations, written correspondence, and in at least one meeting with Plaintiff's employee, Frank Tanzola, that Plaintiff litigate and defend against claims.  (Def. Webber's Resp. to Pl.'s Mot. for Summ. J. ¶ 18.)  Webber does not produce evidence of any verbal communications on the subject.  Although the letters Webber attaches to his response to Plaintiff's motion for summary judgment dispute certain claims by subcontractors, nowhere in

the letters do Defendants explicitly request that Plaintiff litigate and defend against such claims. In one letter, dated December 1, 2005, from Defendants to Plaintiff, Defendants took the position that a certain subcontractor's claim was valid, but that because Cheltenham Township had refused to pay Anchor, Defendants were not requesting that Plaintiff settle the claim. In letters from Defendants to Plaintiff dated February 2, 2006 and March 23, 2006, Defendants state their position that the bond does not exist for claims purposes because the obligee never purchased or paid for the bond, canceled the contract and bond, or informed Plaintiff of any claims under the bond, and that neither the obligee nor the principal requested Plaintiff to settle any claims.

The above arguments fundamentally misunderstand the plain language of the binding Agreement of Indemnity, which provides that the surety may make good faith payment on the bonds whether or not liability, expediency, or necessity existed and that the surety has the right to settle any claim upon the bonds, unless the contractor and indemnitors request the surety to litigate or defend such claim and, at the time of the request, deposit with the surety cash or collateral to be used in paying any judgments and costs. Regardless of whether Plaintiff should have supplied the bonds, the terms set forth in Paragraphs Second and Thirteenth of the Agreement of Indemnity, quoted above, executed by Webber are fully enforceable, and Webber freely executed the contract and agreed to these terms.

Webber has not produced any evidence that Defendants requested that Plaintiff litigate and defend against the claims, and it is undisputed that Defendants never deposited with Plaintiff any cash or collateral for such litigation or defense per the Agreement of Indemnity. Plaintiff settled the payment bond claims after it reviewed the claims and incurred costs and expenses, including attorney's fees, in investigating the claims, which costs and expenses are compensable

under the Agreement of Indemnity. Therefore, no dispute of material fact exists and Plaintiff is entitled to judgment as a matter of law for the amount of $89,076.00.

### IV.  Plaintiff's Motion for a Preliminary and Permanent Injunction

**A.  Legal Standard for the Injunctive Relief Sought**

Plaintiff seeks injunctive relief in the form of a decree for specific performance to compel Defendants to post collateral in the amount of $390,924.00, as correctly recalculated by the court, to cover Plaintiff's potential liability under the bonds. This relief is available under Pennsylvania case law. See, e.g., U.S. Fid. & Guar. Co. v. Feibus, 15 F. Supp. 2d 579, 588 (M.D. Pa. 1998) (finding that the surety was entitled to specific performance in order to protect its bargained-for rights to collateral security and that a surety's right to collateralization cannot be adequately remedied through monetary damages), aff'd, 185 F.3d 864 (3d Cir. 1999).

The Third Circuit directs courts to consider four factors in evaluating a party's motion for preliminary injunction:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999) (citation omitted).

**B.  Discussion**

The court finds that all four factors weigh in favor of granting the preliminary injunction in the form of specific performance. It is undisputed that Cheltenham Township has made a

claim against the performance bond, Plaintiff has established a reserve against the bond for its potential liability, Plaintiff has made demands for collateral, and, because Defendants have not posted collateral, Plaintiff remains under-collateralized against any loss in the amount of $390,924.00 with regard to Cheltenham Township's claim.

First, the court finds that Plaintiff is likely to succeed on the merits because the valid and binding Agreement of Indemnity provides Plaintiff with the right to be collateralized as soon as liability is asserted and courts have routinely upheld such a provision.  See, e.g., Colonial Sur. Co. v. MedTek, Inc., Civ. Action No. 03-6377, 2005 U.S. Dist. LEXIS 3147, at *8-9 (E.D. Pa. Feb. 24, 2005) (explaining that courts routinely uphold collateral security provisions); Feibus, 15 F. Supp. 2d at 588 ("If the claim on the bond must be paid, then the surety will pay the loss from the principal's funds; otherwise the surety must return the funds to the principal. . . . Thus, there is no windfall for the surety.").  Defendant Webber again argues that Plaintiff does not have a reasonable likelihood of prevailing because there would not have been a default had Plaintiff assisted in financing the Project.  Even if Webber's argument were substantiated, which it is not, this does not excuse Webber from performing under the collateral security provision of the binding Agreement of Indemnification.  The court rejects this argument and other arguments previously asserted by Webber for the reasons discussed above.

Second, the court finds that Plaintiff will suffer irreparable injury absent a preliminary injunction.  By providing bonds to the principal, the surety is exposed to risks of claims against the bonds, and Plaintiff here is potentially liable for the claims and the penal sums of its bonds.  The collateral security provision here is a measure of protection against such risks.  Unlike a claim for damages, the collateral security is merely a trust fund to be held by the surety and must

be repaid to the principal in the event that damages are reduced or not awarded.  See Feibus, 15 F. Supp. 2d at 588.  If Plaintiff is deprived of the bargained-for collateral security, it will face the risk of being a general unsecured creditor of Defendants and of not being able to collect.  To protect Plaintiff from becoming a general creditor, the grant of specific performance to enforce the collateral security provision is warranted.  See id.  Defendant Webber argues that Plaintiff will not be irreparably harmed, and that this court should delay an obvious ruling, because Plaintiff's assets are great.  This argument carries no weight.

      Third, the court finds that Defendants will not suffer irreparable harm if the injunction is issued.  Defendant Webber argues that he will face the greater harm because he would be forced to sell a restaurant in which he has ownership interests.  Although the court is sympathetic to Webber's financial difficulties, it must reject his argument.  The issuance of an injunction will only require Defendants to do that to which they agreed – to place Plaintiff in funds – and will only permit Plaintiff to retain the funds until the rights of Plaintiff, Defendants, and Cheltenham Township can be determined.  Defendants are not unfairly prejudiced by being held to the Agreement of Indemnity to which they were signatories.

      Finally, the court finds that the issuance of a preliminary injunction furthers the public interest by recognizing and enforcing the plain language of a binding surety indemnification agreement.  It is undisputed that Anchor is a public works contractor and that the performance and payment bonds at issue are public works bonds for a project in Pennsylvania, as required by the Public Works Contractors' Bond Law of 1967, 8 P.S. § 193.  Pennsylvania has an important interest in seeing that the contractors on public works projects use contract funds to perform the work and pay subcontractors and suppliers, as well as adhere to the performance and payment

provisions of the contracts and the Pennsylvania Procurement Code, 62 Pa.C.S. § 101, et seq. The grant of a preliminary injunction vindicates this interest and encourages confidence in the surety bond process.

The court hereby makes the preliminary injunction permanent. The language of the Agreement of Indemnification remains unchanged, and is enforceable preliminarily and permanently for the same reasons provided above. Plaintiff is entitled to the specific performance of the Agreement's collateral security provision. Defendants shall immediately deposit the sum of $390,924.00, as correctly recalculated by the court, with Plaintiff to be held by Plaintiff until Cheltenham Township's claim is resolved.

## V.  Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment and Motion for a Preliminary and Permanent Injunction are granted. An appropriate Order follows.